# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KIBBY L. GROSJEAN,               )
                                 )
Plaintiff,                       )
                                 )
vs.                              )        No. 1:13-CV-88
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of           )
Social Security,                 )
                                 )
Defendant.                       )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Kibby L. Grosjean. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On July 13, 2009, Plaintiff, Kibby L. Grosjean ("Grosjean"), applied for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq.* She also applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. section 1381 *et. seq.*

Grosjean alleged her disability began on May 17, 2003. The Social Security Administration denied her initial applications and also denied her claims on reconsideration. On July 28, 2011, Grosjean appeared with her attorney and testified at an administrative hearing before Administrative Law Judge ("ALJ") Warnecke Miller ("Miller"). In addition, Georgette Gunther testified as a vocational expert ("VE"). On September 15, 2011, ALJ Miller denied Grosjean's claims, finding that Grosjean had not been under a disability as defined in the Social Security Act.

Grosjean requested that the Appeals Council review the ALJ's decision. This request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005). Grosjean has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Grosjean was born on January 6, 1959, and was 44 years old on the alleged disability onset date. (Tr. 212). Grosjean's alleged impairments include fibromyalgia, non-insulin dependent diabetes mellitus, headaches, hypertension, chronic fatigue, diverticulitis, obesity with basal metabolic indicator of 33.7, osteoarthritis, GERD, minor spondylosis of the C4-C6 level, mild degenerative changes of the lumbar spine, carpal tunnel syndrome, depression, post traumatic

stress disorder ("PTSD"), asthma, alcohol abuse (now in recovery), history of diagnosis of borderline intellectual functioning, and "neuropathy of the heart." (Tr. 17-18). She has a high school education. (Tr. 258). Her past relevant work includes work as an assembler, cashier, and stock clerk. (Tr. 26-27). The medical evidence[1] can be summarized as follows:

## Park Center

Grosjean first treated at Park Center in 1990. (Tr. 493). After a break in treatment, Grosjean presented in July of 2007 requesting services for outpatient therapy. (Tr. 405-11). She had previously been involved with Dialectic Behavioral Therapy ("DBT")[2], but that did not go well for her. (Tr. 405-11, 676). On mental status exam she had the following significant positive findings: excessive worry; aches and pains; anxiety; fearfulness, and helpless thought content. (Tr. 405). She appeared disheveled, overweight, withdrawn, and with limited insight and judgment. (*Id.*). Her problems included psychiatric instability, anger issues, abuse issues, relationship deficits, alteration in mood/depression, health maintenance deficit, and anxiety. (Tr. 408). She was diagnosed with Post Traumatic Stress

---

[1]The medical evidence in this case is largely undisputed and the Court has therefore relied heavily on the facts as presented in Grosjean's opening brief, supplementing and editing where necessary.

[2] Dialectical Behavior Therapy is a cognitive-behavioral treatment developed to treat chronically suicidal individuals with borderline personality disorder. http://behavioraltech.org/resources/whatisdbt.cfm (last visited September 12, 2014). It is effective in reducing suicidal behavior, psychiatric hospitalization, treatment dropout, substance abuse, anger, and interpersonal difficulties. *Id.*

Syndrome; major depressive disorder, recurrent unspecified; and borderline personality disorder. (*Id.*).

In November of 2007, Grosjean saw Viann Ellsworth ("Ellsworth"), a psychiatric nurse with Park Center. (Tr. 412). On mental status exam she had the following positive signs: depressed mood; blunted affect; helpless, worthless, and hopeless thought content; and recent memory problems. (Tr. 412-13). Ellsworth found that her treatment response was "worse." (Tr. 213). Ellsworth noted that her medications were not completely addressing her symptoms, but Grosjean did not want to change medications before the holidays. (Tr. 414).

Grosjean was seen again in January of 2008. (Tr. 416). On mental status exam she had the following positive signs: depressed and anxious mood; helpless and hopeless thought content; suicidal ideation without plan or intent; and homicidal ideation without plan or intent. (Tr. 416-17). Her treatment response was noted as "worse." (Tr. 418). Grosjean reported agitation, mood swings, depression, suicidal and homicidal thoughts at times, hypersomnia, isolation, and anxiety. (*Id.*)

In May of 2008, Grosjean saw Ellsworth again. (Tr. 420-23). The mental status exam shows the following positive findings: depressed mood, blunted affect, and helpless and hopeless thought content. (*Id.*). Her treatment response was noted as "worse." (Tr. 422).

In September of 2008, she saw Ellsworth, and on mental status exam she had the following positive findings: withdrawn behaviors and

anxious mood. (Tr. 424). Ellsworth found that Grosjean's treatment response was "worse." (Tr. 425). Grosjean reported that she was having increased flashbacks, felt on edge, and felt like crying but could not, and was always tired. (*Id.*). Her fibromyalgia was bothering her, but her doctor would not give her adequate pain medications. (*Id.*). In March of 2009, she was seen again by Ellsworth, and she reported sleep problems. (Tr. 428). She reported that the medications helped her, but she had quite a few stressors. (*Id.*). On mental status exam she had the following positive signs: fluctuating mood; paranoid and helpless thought content; impaired recent memory; and blunted affect. (Tr. 428-30). She found that her patient was "symptomatic but stable." (Tr. 430). She was seen again in May of 2009, and she reported that she had been depressed and stressed off and on. (Tr. 433). She wanted to sleep a great deal, but she could not. (*Id.*). On mental status exam she had the following positive findings: depressed mood; hopeless and helpless thought content; impaired recent memory; and blunted affect. (Tr. 433-35). In regard to medication compliance she found that she had missed doses a couple of times, and she was slightly worse from a treatment standpoint. (Tr. 435). Remeron 15 mg was added. (Tr. 436). She was seen again in December of 2009, and she was having more flashbacks since her ex-husband tried to force her to have sex. (Tr. 512). Her sister also called which triggered flashbacks about sexual abuse that her sister perpetrated on her when she was a child. (*Id.*)

For two weeks she had problems getting to sleep even though she was taking Cymbalta and Seroquel. (*Id.*). On mental status exam she had the following positive signs: anxious mood; paranoid and helpless thought content; impaired recent memory; and impaired remote memory. (Tr. 513). Ellsworth found that her patient's condition was "slightly worse." (*Id.*). She was told to take Cymbalta in the a.m. (Tr. 515). In May of 2010, she reported to Ellsworth that she was starting to get a little edgy and irritable. (Tr. 507). On mental status exam she had the following positive signs: hopeless, helpless, and worthless thought content and impaired recent memory. (Tr. 508). She reported that she had not been coping well with her brother's death, and she was angry. (*Id.*). Her son had been in trouble, and he had been beating up on Grosjean. (*Id.*). Her house was a "total disaster." (*Id.*). Grosjean was, according to Ellsworth, "much worse." (Tr. 510).

In June of 2010, Grosjean saw Ellsworth and reported that she was still grouchy and uptight as well as crying. (Tr. 502). Grosjean had noticed a little improvement with the addition of Remeron but not a great deal. (*Id.*). She reported that she had a therapist who would come to her house and work with her. (*Id.*). She had sleep problems that involved awakening in the middle of the night. (*Id.*). On mental status exam she had the following positive signs: tearful behavior; paranoid, hopeless, helpless, and worthless thought content; and impaired recent memory. (Tr. 502-04). She was fully compliant with

treatment, and she was slightly better. (Tr. 504). Her Remeron was increased to 30 mg. (*Id.*).

P. Samant ("Samant"), MSED, of Parke Center evaluated Grosjean in June of 2010. (Tr. 493-500). She had been referred to Samant by her son's caseworker. (Tr. 493). She was re-experiencing her symptoms when she was around her two sons who were aggressive towards each other and towards Grosjean. (*Id.*). She was recommended for home-based services. (*Id.*). She reported experiencing severe anxieties related to her past trauma of physical and emotional abuse from her childhood. (*Id.*). She was also having difficulty with parenting her children due to limitations of her mental health conditions. *(Id.).* She reported that she had had children removed from her care in the past. *(Id.).* She had a 25-year-old daughter and two younger sons. *(Id.).* She reported an extensive history of mental disorder and treatment. (Tr. 494). She was having significant problems such as flashbacks, unwanted thoughts, and/or constant anxiety related to past trauma. (Tr. 495). She had post traumatic stress difficulties, and she had experienced one episode of sexual abuse. (*Id.*). She had experienced intrusive thoughts that interfere with the ability to function in some life domains. (*Id.*). She also reported that she worried excessively, and she had poor grooming and hygiene. (*Id.*). She had minimal insight, and she was anxious and fearful. (*Id.*). She reported significant periods of time in which she did not remember what she had done or where she had been. (*Id.*).

She was unable to stay on task. (*Id.*). She had trouble shifting from one activity to another. (*Id.*). She would become agitated when confronted with a problem, and she had difficulty thinking through problems and consequences. (Tr. 496). She had a debilitating level of anxiety as well as trouble sleeping. (*Id.*). She was frequently irritable or others complained that she was irritable. (*Id.*). She had a loss of interest and pleasure, and she was experiencing pervasive sadness. (*Id.*). She had a moderate level of depression. (*Id.*). Her diagnosis was PTSD; major depressive disorder, recurrent unspecified; and borderline personality disorder. (Tr. 498). Her Global Assessment of Functioning ("GAF") was rated at 45.[3] (Tr. 499).

Grosjean was seen by Ellsworth again in September of 2010, and she reported that her medications were working "pretty good." (Tr. 572). She was a little more irritable, and she was forgetting her morning medications until afternoon. (*Id.*). She continued to have problems sleeping due to pain, and she was also sleepy during the day.

---

[3] GAF is a scoring system for measuring an individual's overall functional capacity. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000)(hereinafter "DMS-IV-TR"). GAF is the clinician's judgment of the individual's overall level of functioning. *Id.* at 32. The GAF scale is to be rated with respect only to psychological, social, and occupational functioning. *Id.* The GAF scale is divided into 10 ranges of functioning. *Id.* at 32-34. Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning. *Id.* at 32. The description of each 10-point range in the GAF scale has two components: the first part covers symptom severity, and the second part covers functioning. *Id.* The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. *Id.* In most instances, ratings on the GAF scale should be for the current period—i.e., the level of functioning at the time of the evaluation. *Id.*
   A GAF of 45 is in the decile described as serious symptoms, any serious impairment in social, occupational, or school functioning—e.g., no friends, unable to keep a job. *Id. at 34.*

(*Id.*).  On mental status exam she had the following positive findings: fluctuating and irritable mood; worthless thought content; and impaired recent memory.  (Tr. 572-73).  Her condition was described as slightly worse, and her Remeron was increased to 45 mg.  (Tr. 575).

In February of 2011 she was seen again, and she reported having nightmares of past abuse.  (Tr. 549).  She was acting these out in her sleep, and she was afraid that someone would get hurt.  (*Id.*).  She had been under a great deal of stress.  (*Id.*).  She had sleep problems because of trauma based on nightmares as well as appetite problems. (*Id.*).  On mental status exam she had the following positive signs: depressed, anxious, and irritable moods; paranoid, helpless, worthless, and hopeless thought content; suicidal ideation without plan or intent; homicidal ideation without plan or intent; and overactive and tearful behavior. (Tr. 549-51).  Ellsworth found that Grosjean was "much worse."  (Tr. 552).  She added Periactin. (*Id.*).

In March of 2011, she told Ellsworth that her medication was working, but she had a tough time getting them.  (Tr. 711).  On mental status exam she had the following positive signs: a fluctuating mood and paranoid, helpless, worthless, and hopeless thought content.  (Tr. 712).  She was found to be fully compliant, and the assessment of her treatment was that she was "much better."  (Tr. 713-14).

In May of 2011, Grosjean reported that the medications were working "pretty good," and she was doing better.  (Tr. 682).  She was still having problems with sleep because she did not have pain

medications. (*Id.*) On mental status exam she had the following positive signs: fluctuating mood; hopeless, helpless, and worthless thought content; and impaired recent memory. (Tr. 682-83). The assessment was that she was "much better." (Tr. 684).

In March of 2011, she underwent an extensive psychological evaluation by Dr. Danielle Wardell and Dr. Kimberly Harrison at the request of her home-based caseworker. (Tr. 675). The testing was done to clarify diagnosis, determine her overall IQ, and assess parenting needs. (*Id.*). The caseworker made the referral upon the recommendation of the court system which Grosjean was involved with due to her son not getting to school on a regular basis. (*Id.*). IQ testing showed that she was in the average range. (Tr. 676-77). She was administered the PAI to assess her personality functioning. (Tr. 677). The results were valid and considered an accurate reflection of her personality functioning at that time. (*Id.*). There were two clinical scales that were significantly elevated, the somatization and anxiety-related disorders. (*Id.*). It was noted that individuals who have significant elevations on these scales typically report functional impairment due to symptoms associated with sensory or motor dysfunction, typically they are preoccupied with physical health status and physical health problems, have multiple anxiety disorders associated with psychological turmoil, faced with constant rumination, and are often guilt-ridden and prone to past transgressions, real or imagined. (*Id.*). It was also found that she likely engages in a

number of maladaptive behavioral patterns aimed at controlling
anxiety, but that they were probably ineffective in preventing
intrusive experiences such as nightmares and flashbacks. (*Id.*). On
the MCMI-III her personality functioning was also assessed, and it was
considered valid and accurate. (*Id.*). The results indicated that she
was experiencing a considerable amount of post-traumatic stress such
as nightmares, flashbacks, foreshortened sense of future, as well as
general anxiety such as restlessness, being prone to worry, and
feeling out of control due to her worry. (*Id.*). She also appeared to
have a personality trait of compulsiveness - she has difficulty being
flexible, adhering to rigid routines, and expects perfection. (*Id.*).
She was also experiencing a significant amount of depressive symptoms
such as depressed mood, loss of interest, loss of energy, and sleep
difficulties. (*Id.*). She was administered the TSI in order to assess
the presence of post-traumatic stress symptoms at that time. (*Id.*).
The results were considered valid. (*Id.*). Three scales were
significantly elevated. (Tr. 678). The first one was depression which
reflected frequent feelings of sadness and unhappiness and a general
sense of being depressed, feeling worthless and inadequate, having
hopeless views of the future, a tendency at times to have thoughts of
death and dying, tearfulness, and isolating herself from others.
(*Id.*). She also appeared to be experiencing some significant amount
of intrusive experiences such as nightmares, flashbacks, and intrusive
ideation that can be quite upsetting. (*Id.*). She engaged in a

significant amount of defensive avoidance where she is repeatedly seeking to eliminate painful thoughts or memories from her consciousness. (*Id.*). One conclusion was that the depressive symptoms impact her parenting role in that she likely cannot generate the emotional and/or physical energy it takes to parent her children, particularly her two sons who were having considerable behavioral difficulties at that time. (Tr. 679). Her diagnosis was major depressive disorder, recurrent, moderate and PTSD, chronic; rule out traits of obsessive-compulsive personality disorder. (Tr. 680). Her GAF was rated at 51.[4] (*Id.*).

Her progress was tracked through her Treatment Plan. In September of 2010 her diagnosis was PTSD; major depressive disorder, recurrent unspecified; and borderline personality disorder. (Tr. 577). According to the treatment plan, her GAF was rated at 45.[5] (*Id.*). She reported that she continued to have mood swings and thinks about her past physical and sexual abuse, and then stated that she feels "sad and frustrated sometimes." (Tr. 581). She is currently working with her therapist on past abuse, but the therapist had reported that she missed the last two appointments. (*Id.*). She had the same diagnosis and GAF listed in her December 2010 treatment

---

[4] A GAF of 51 shows moderate symptoms or difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). DSM-IV-TR at 34.

[5] As noted previously, a GAF of 45 shows serious symptoms or difficulties in social, occupational, or school functioning—e.g., no friends, unable to keep a job. DMS-IV-TR at 34.

plan.[6] (Tr. 556). She continued in the home-based services program and she was willing to work on her treatment goals. (Tr. 559). She continued to exhibit stress related to her sons, had difficulties communicating her feelings, and stated that her "PTSD feelings come and go." (*Id.*). Her caseworker was working with her to improve her parenting and communication skills, and she was getting along better with others. (*Id.*). In March of 2011 her diagnoses were the same, but her GAF was 51.[7] (Tr. 705). She continued to exhibit occasional flashbacks, sad affect, mood swings, and difficulties in getting her children to follow directions. (Tr. 709). Grosjean appeared unmotivated at times in keeping her house clean and following through with the consequences she gives her children. (*Id.*).

The records demonstrate that Grosjean received extensive counseling, follow-up, and home-based treatment. (Tr. 491, 554, 562, 564, 566, 568, 570, 583, 587, 589, 593, 595, 597, 663, 665, 673, 687, 689, 691, 692, 695, 697, 699, 701, 703, 716, 718, 720, 722, 724, 726, 728, 730, 732, 735, 736, 738, 740, 742, 744, 746, 748, 750, 752, 754, 756, 758, and 760). Grosjean was not paying her bills, and had been scammed out of money. (Tr. 745). Her home was eventually condemned. (Tr. 752, 756). Her two boys were taken from her care and placed in

---

[6] The Commissioner asserts that the GAF was not reassessed - that it reflects a duplication of the previously measured GAF. (DE 24 at 7). This Court is not certain if this is a newly assessed GAF or not, but ultimately, it is not material to the outcome of this case.

[7] Again, a GAF of 51 shows moderate symptoms or difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). DSM-IV-TR at 34.

a shelter. (Tr. 748).

In August of 2011, Ellsworth completed a "Mental Impairment Questionnaire." (Tr. 762-66). Ellsworth reported her current symptoms as fluctuating moods; feelings of helplessness, hopelessness, and worthlessness; and impaired recent memory. (Tr. 762). In regard to depressive episodes she found that Grosjean had never been totally free from depressive symptoms since 2007 when these symptoms had been moderate to severe in intensity and had significantly interfered with her ability to function. (*Id.*). In the last four months they have been moderate to mild and interfere less often. (*Id.*). Ellsworth found that Grosjean had frequent flashbacks and nightmares of abuse that interfere mildly with her ability to function. (*Id.*). She has had at least two severe episodes of flashbacks and nightmares that have interfered significantly with her ability to function for two to four weeks at a time since November of 2007. (*Id.*). At the time of the assessment, Grosjean felt that she had fair control of her moods, but based on her past, this control is easily lost and severely interferes with her ability to function for weeks to months at a time. (Tr. 763). Ellsworth found that Grosjean would have problems with absenteeism because she frequently has difficulty sleeping as a result of depression, flashbacks, and nightmares which make it difficult for her to function the next day. (*Id.*). She found that Grosjean would miss greater than three days of work a month due to these problems. (*Id.*). Ellsworth also found that Grosjean would have difficulty

maintaining attention and concentration in unskilled work because depression makes it difficult for her to concentrate and stay on task. (*Id.*). Furthermore, Grosjean could be unexpectedly triggered about memories of past abuse and when triggered, she is unable to focus on work tasks. (*Id.*). Ellsworth opined that Grosjean would be able to concentrate and pay attention for less than 85% of the workday. (Tr. 764).


Dr. Daniel Hauschild

Dr. Daniel Hauschild ("Dr. Hauschild") performed a psychological evaluation at the request of Social Security in October of 2009. (Tr. 447). Grosjean told Dr. Hauschild that she is sometimes too tense, and she cannot stop thinking in order to fall asleep. (*Id.*). She reported bad dreams and a history of severe nightmares. (*Id.*).

She also reported that when she was awake she would have episodes of disassociation and would see her abusers. (*Id.*). She goes blank, and she has to touch something to bring herself back to reality. (*Id.*). She stated that her flashbacks are triggered by sights, smells, and seeing her sons fighting. (*Id.*). She also ruminates about her appointments. (*Id.*). She is sometimes up until two or three a.m. due to being in pain, but she is more able to maintain her sleep since she started taking Lyrica and Vicodin. (*Id.*). On some days she hurts so much that she cannot do anything, and she frequently just sits. (*Id.*). She admitted that sometimes she has trouble

-15-

getting out of bed, and she can keep hitting the snooze button. (*Id.*). She reported that once she gets up, she can keep going though she still needs to take short breaks. (*Id.*). She also reported problems with concentration at times. (*Id.*). She also acknowledged feelings of worthlessness, and she reported that she makes self-deprecating statements. (Tr. 448). In regard to how she spent most of her time each day, she reported that she cleaned a little, rested, ate, took a nap, and then ate a snack, did more work, and then watched TV for about two hours. (*Id.*). She reported that her ability to do dishes, vacuuming, and laundry depend upon the day and how she was feeling physically. (Tr. at 449). She reported that she needed assistance with shopping. (*Id.*). On mental status exam she repeated five digits forward and three digits backward. (Tr. 449). She could recall two out of four items that had been presented to her five minutes earlier. (*Id.*). In regard to serial 7's she gave up after sixty seconds. (Tr. 450). She appeared mildly depressed. (Tr. 451). She acknowledged some crying spells and irritably. (*Id.*). She also admitted to thinking about suicide. (*Id.*).

His diagnostic impression was PTSD and major depressive disorder, recurrent, severe without psychotic features. (*Id.*). He rated her current GAF as 47. (Tr. 452).

<u>Drs. J. Gange and F. Kladder</u>

Dr. Gange completed a psychiatric review technique form on November 08, 2009. (Tr. 466). Dr. Gange noted that Grosjean had affective disorders and anxiety-related disorders. (Tr. 466). Dr. Gange found that she had mild limitations in daily living activities and in maintaining social functioning. (Tr. 476). She had no episodes of decompensation. (*Id.*). She also had a moderate degree of limitation in concentration, persistence, and pace. (*Id.*).

Dr. Gange also completed a "Mental Residual Functional Capacity Assessment" on November 8, 2009. Dr. Gange found that she was "moderately limited" in her mental abilities to maintain attention and concentration for extended periods; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independent of others. (Tr. 480-81). Dr. Gange noted a remote treatment history through Park Center, and that she had not required recent treatment as she obtained medications from her primary care provider. (Tr. 482). Dr. Gange also found that her activities of daily living remain intact within physical parameters. (*Id.*). Dr. Gange concluded that the intensity of the symptoms and their impact on functioning were not consistent with the totality of the evidence, and specifically her ability to complete tasks on a sustained basis did not appear to be severely restricted within physical parameters. (*Id.*).

In January of 2010, Dr. Kladder affirmed the findings of Dr.

Gange as reported.  (Tr. 487).

Ortho Northeast

Grosjean saw Dr. Eric Jenkinson of Ortho Northeast ("ONE") in
June of 2007 for fibromyalgia.  (Tr. 309).  She had pain basically in
all joints, shoulders, neck, hips, back, knees, and ankles.  (*Id.*).
She had recently been diagnosed with fibromyalgia.  (*Id.*).  He noted
that Grosjean had been tested for rheumatolic problems, but tests were
negative.  (*Id.*).  Grosjean had tried a little therapy but had to stop
because of insurance issues.  (*Id.*).  He gave her some Vicodin and
continued her Naproxen.  (Tr. 310).  He talked about Lyrica and
getting back to therapy. (*Id.*).

Grosjean was seen at ONE again in August of 2009 by Dr. Michael
McNamus for chronic pain in both of her ankles.  (Tr. 456).  Symptoms
had been present for many years, but became progressively worse with
time.  (*Id.*).  An x-ray taken in the office of the bilateral ankles
revealed degenerative changes of the medial and lateral ankle gutters
as well as anterior osteophyte formation at the tibiotalar joint.
(Tr. 457).  His diagnosis was degenerative arthritis, bilateral
ankles, with ankle instability and hammer digit syndrome.  (*Id.*).
They discussed conservative treatment.  (*Id.*).

Dr. Jenkinson saw Grosjean again in early September of 2009.
(Tr. 454).  On exam Grosjean had some mild carpal tunnel symptoms or
findings, and the tinel and phalen testing was mildly positive in the

bilateral shoulders. (Tr. 454). Dr. Jenkinson's diagnosis was fibromyalgia as well as carpel tunnel, impingement of the shoulders, lumbar spine spasms and possible facet irritation. (*Id.*). She was seen by Dr. Jenkinson again in October of 2009 for a follow-up on her fibromyalgia and possible impingement carpel tunnel syndrome. (Tr. 453). She was doing better. (*Id.*). On physical exam she had mildly positive impingement on testing. (*Id.*).

She was seen again in October 2010 by Dr. Jenkinson, and an MRI showed that L4-5, L5-S1 and L3-4 had some mild degenerative change and some mild bulging. (Tr. 524-26). There also appeared to be an annular tear in L4-5. (*Id.*). This caused a little foraminal narrowing and mild facet arthropathy at this level as well as at L5-S1. (*Id.*).


Dr. Robert Godley

She was seen by Dr. Godley in November of 2008 due to sharp substernal discomfort and then pressure discomfort over the left breast with activity such as walking upstairs or if she becomes upset for the past several months. (Tr. 316). He ordered testing. (Tr. 317). In December of 2008, Dr. Godley discussed the test results with Grosjean. (Tr. 339). The echocardiography was normal. (*Id.*). However, her Myoview stress test was markedly abnormal with a moderate amount of ischemia in the LAD distribution, anteroseptal and interior regions. (*Id.*). The ejection-fraction was 57%. (*Id.*). He recommended cardiac catherization. (*Id.*). This testing was done in

December of 2008, and the results were normal.  (Tr. 341).

Dr. H. M. Bacchus

In September of 2009, Grosjean saw Dr. Bacchus at the request of
Social Security.  (Tr. 443-45).  She reported a history of her mental
health problems.  (*Id.*).  She also told him about her fibromyalgia,
diabetes, intermittent tingling and numbness in her fingers and toes,
shortness of breath, chest pain, and headaches.  (*Id.*).  Review of
systems was positive for exertional shortness of breath and fatigue,
depression, insomnia, chest pains, and some other problems.  (Tr.
444).

On physical exam she was 65 inches tall and weighed 208 pounds.
(*Id.*).  Her gait was slightly antalgic secondary to left hip and leg
pain.  (*Id.*).  Muscle strength and tone were 5/5 in all extremities
except the lower left extremity which was 4/5. (*Id.*).  Grip strength
was 4/5 bilaterally, and fine finger manipulation was preserved.
(*Id.*).  There were slight sensory deficits in the distal fingers and
toes.  (*Id.*).  She had a flat affect and depressed mood.  (*Id.*).

His impression included fibromyalgia, non-insulin dependent
diabetes mellitus, headaches, depression/anxiety, PTSD, asthma,
hypertension, exertional dyspnea per history, history of atypical
chest discomfort with negative cardiac work-up, hyperlipidemia,
chronic fatigue, diverticulitis, and history of alcohol abuse now in
recovery.  (Tr. 445).

In January of 2010, Dr. M. Hasanadka reviewed all the evidence in the file and affirmed Dr. Bacchus' opinion as written. (Tr. 488).

## State Agency Physical Residual Functional Capacity Assessment

In an undated and unsigned form, a state agency physician found that Grosjean could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull the same amounts as shown for lift and/or carry. (Tr. 456-65). The state agency physician also found non-exertional limitations. These included only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 460). There was also a limitation of never climbing ladders, ropes, or scaffolds. (Tr. 460). Grosjean was limited in her ability to reach overhead due to pain and limited range of motion. (Tr. 461).

## Grosjean's Testimony

At the hearing before ALJ Miller, Grosjean testified that she has a high school education. (Tr. 44). She began studying data entry at a community college, but she did not finish the course due to flashbacks. (*Id.*).

When asked why she cannot work full time, Grosjean responded by noting a variety of physical complaints:

> Well, I can't stand for very long of a time
> because my back and my feet start hurting. And
> then I have other body parts that hurt, you know,
> to lift, and I can't lift over my head. This is
> as far as I can go right here, is lifting --
> that's it. And then I can't bend. They told me
> no bending, no stooping because of my back. And
> my ankles --they told me I couldn't do a job
> where I had to do a lot of walking or walking up
> steps.

(Tr. 55). She testified to pain throughout her body, with most of it
in her feet, hands, back and shoulders. (Tr. 56). The pain shifts.
(*Id.*). She also testified to debilitating headaches occurring at
least once a week. (Tr. 69).

When asked what an average week would look like for her, Grosjean
noted the following:

> Well, now it takes me like a whole day to clean
> my house. Actually, the whole week, because I
> could only do a little bit each day and I'll have
> to lay down and take a nap because I do have
> chronic fatigue syndrome and I get tired. So I
> lay down and especially if I start hurting. And
> then I'll get up. You know, I'll lay down for a
> couple hours and then get up and do a little bit
> more. Then my whole day does that. And if I,
> like if I'm out and I have to get in and out of
> my car, when I had my car --I don't have one now
> --but when I did it was very difficult for me
> because of the getting in and out and in and out
> and it just, it wore me out and I just would hurt
> really bad. And like when I have to catch the
> bus it's hard for me to get up on the bus because
> it's hard for me to step up.

(Tr. 56-57).

With regards to her mental impairments, she testified that she
disassociates or blacks out due to her PTSD. (Tr. 60). She also
suffers from angry outbursts, memory loss, nightmares, flashbacks, and

intrusive thoughts.    (Tr. 60-61).    She sleeps a lot and reports feeling depressed. (Tr. 61-62).   She finds going out of the house stressful.  (Tr. 65).   Crowds bother her as well.  (*Id.*).   She cries a lot.  (Tr. 65).

She does not clean her house and links this to her depression - she cannot get motivated to do it.  (Tr. 66).  She explained that her home was condemned because welfare came and the lights and electric were not on.  (Tr. 67).  Also, the house was a mess.  (*Id.*).  She had not been upstairs in about a month and they took picture of the messes up there.  (*Id.*).  After her home was condemned, she lived in a homeless shelter, and her children (ages 12 and 15) were placed in foster care.  (Tr. 57, 67).


Testimony of VE Georgette Gunther

VE Gunther testified that, in her opinion, full-time competitive employment would require that an individual be on-task for 80% of the work day.  (Tr. 79).  In addition, an individual who has more than one unscheduled absence per month would not be capable of competitive employment.  (*Id.*).


Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits.  42 U.S.C. § 405(g).  "The findings of the Commissioner of Social Security as to any fact, if supported

by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347, F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

-24-

Step 2:    Is the claimant's impairment or combination of impairments
           "severe" and expected to last at least twelve months?  If
           not, the claim is disallowed; if yes, the inquiry proceeds
           to Step 3.

Step 3:    Does the claimant have an impairment or combination of
           impairments that meets or equals the severity of an
           impairment in the SSA's Listing of Impairments, as
           described in 20 C.F.R. § 404, Subpt. P, App. 1?  If yes,
           then claimant is automatically disabled; if not, then the
           inquiry proceeds to Step 4.

Step 4:    Is the claimant able to perform his past relevant work?
           If yes, the claim is denied; if no, the inquiry proceeds to
           Step 5, where the burden of proof shifts to the
           Commissioner.

Step 5:    Is the claimant able to perform any other work within his
           residual functional capacity in the national economy: If
           yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also*

*Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

    In this case the ALJ found that Grosjean was not engaged in

substantial gainful activity and that she suffered from multiple

severe impairments.  The ALJ further found that Grosjean did not meet

or medically equal one of the listed impairments.  The ALJ found that

Grosjean retained the physical residual functional capacity to perform

a reduced range of light work.  More specifically, the ALJ found that:

           [T]he claimant has the residual functional
           capacity to perform light work as defined in 20
           CFR 404.1567(b) and 416.967(b) except she can
           occasionally lift/carry twenty pounds and
           frequently lift/carry ten pounds.  She can
           stand/walk for six hours out of an eight-hour day
           and sit for six hours in an eight-hour day.  She
           can occasionally bilaterally push/pull with her
           upper extremity and occasionally use bilateral
           foot controls.  She can occasionally climb ramps

-25-

or stairs but never climb ladders, ropes or
scaffolds. She can occasionally balance, stoop,
kneel, crouch, and/or crawl. She can
occasionally reach overhead. She should avoid
concentrated exposure to fumes, odors, dust
gases, poorly ventilated areas, chemicals and
loud noise environments. She can tolerate
interacting with the public, but cannot tolerate
responsibility for addressing complaints or other
concerns. Based on moderate difficulty with
pace, she cannot tolerate sudden or unpredictable
work place changes and has a pace that is limited
to goal oriented rather than production pace work
(no fast pace).

(Tr. 19-20). With this RFC, the ALJ found that Grosjean could perform

her past relevant work as a cashier. (Tr. 26). The ALJ also found

that Grosjean could perform other work, including work as a

dishwasher, weigher, and producer sorter. Thus, Grosjean's claim

failed at both steps four and five of the evaluation process.

Grosjean believes that reversal is required because the ALJ's

decision was not supported by substantial evidence. More

specifically, Grosjean believes that the ALJ erred by failing to

properly evaluate: (1) the opinion of Ellsworth, a treating

psychiatric nurse; (2) the opinion of Dr. Hauschild, an examining

psychologist; and (3) Grosjean's credibility. Each argument will be

examined in turn.


The ALJ's Consideration of Evidence from Ellsworth

Grosjean claims the ALJ erred in evaluating the evidence obtained

from one of her treating medical providers, Ellsworth. Ellsworth is

a psychiatric nurse. As a result, she is not an "acceptable medical

source," as defined in 20 CFR 404.1513(a) and 416.913(a). The Social Security Administration has provided ALJs with guidance on how to evaluate opinions from medical sources that are not acceptable medical sources in Social Security Ruling 06-03p. SSR 06-03p, 2006 WL 2329939 (2006). There must be some evidence from an "acceptable medical source" for the ALJ to find a medically determinable impairment exists. *Id.* However, opinions from medical sources that are not "acceptable medical sources" are to be considered too. The ruling recognizes that, as our health care system changes and evolves, more and more medical professionals who do not qualify as "acceptable medical sources" are providing medical treatment and evaluation that would have been provided by an "acceptable medical source" in the past. *Id.* at *3. The ruling provides that:

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.
>
> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.
>
> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an

> "acceptable medical source" because, as we
> previously indicated in the preamble to our
> regulations at 65 FR 34955, dated June 1, 2000,
> "acceptable medical sources" "are the most
> qualified health care professions." However,
> depending on the particular facts in a case, and
> after applying the factors for weighing opinion
> evidence, an opinion from a medical source who is
> not an "acceptable medical source" may outweigh
> the opinion of an "acceptable medical source,"
> including the medical opinion of a treating
> source. For example, it may be appropriate to
> give more weight to the opinion of a medical
> source who is not an "acceptable medical source"
> if he or she has seen the individual more often
> than the treating source and has provided better
> supporting evidence and a better explanation for
> his or her opinion. Giving more weight to the
> opinion from a medical source who is not an
> "acceptable medical source" than to the opinion
> from a treating source does not conflict with the
> treating source rules in 20 CFR 404.1527(d)(2)
> and 416.927(d)(2) and SSR 96-2p, "Titles II and
> XVI: Giving Controlling Weight To Treating Source
> Medical Opinions."

*Id.* at *5. Accordingly, the ALJ should at least consider the same

factors he would consider when determining what weight to give to a

medical opinion from an "acceptable medical source." Namely, the ALJ

should apply the following factors to determine the proper weight to

give the opinion:

> (1) the length of the treatment relationship and
> frequency of examination;
>
> (2) the nature and extent of the treatment
> relationship;
>
> (3) how much supporting evidence is provided;
>
> (4) the consistency between the opinion and the record
> as a whole;
>
> (5) whether the treating physician is a specialist;

> (6) any other factors brought to the attention of the
> Commissioner.

20 C.F.R. §§ 404.1527(a)-(d) and 416.927(a)-(d); *Phillips v. Astrue*, 413
Fed. Appx. 878, 884 (7th Cir. 2010)("In deciding how much weight to give
to opinions from these 'other medical sources,' an ALJ should apply the
same criteria listed in § 404.1527(d)(2).").

The ALJ said the following with regard to Ellsworth:

> Although the claimant's mental health nurse is
> not an "acceptable" medical source, the
> undersigned has considered the statements under
> the criteria of 20 CFR 404.1527 and SSR 06-3p,
> which essentially parallel the criteria for
> giving differential weight to medical source
> opinions. The undersigned gives some weight to
> those opinions since she has first-hand knowledge
> of the claimant (Exhibits 25F; 26F). The
> undersigned finds that overall the opinion was
> not supported by the record as a whole. However,
> the undersigned has accounted for the claimant's
> limitations in concentration by restricting her
> to simple work with no fast pace and by avoiding
> sudden or unpredictable work place changes in the
> residual functional capacity above. Likewise,
> the restrictions in the residual functional
> capacity on pace and work-place changes reflect
> this opinion's discussion of the claimant's
> reaction to stress.

(Tr. 25). Grosjean's counsel, after noting that the ALJ failed to
annunciate his reasons for finding that Ellsworth's opinion was not
supported by the record as a whole, speculated based on the ALJ's
opinion that his reasons may have been the following: (1) Grosjean's
activities of daily living remain intact from a mental standpoint
except for any physical limitations; (2) Grosjean treated at Park
Center but that treatment history is remote - she has not required

recent treatment; and (3) there is a lack of "probative evidence" that Grosjean suffered two periods of decompensation. (DE 19 at 17-18, citing Tr. 25-26). Grosjean attempts to explain why each of the ALJ's apparent reasons is not supported by substantial evidence. The ALJ, however, has an obligation to annunciate his opinion in such a manner that meaningful review is possible. *Bradley v. Barnhart*, 175 Fed. Appx. 87, 90 (7th Cir. 2006)("the ALJ must at least minimally articulate his analysis with enough detail and clarity to permit meaningful appellate review."). While the Court appreciates counsel's attempt to understand the basis for the ALJ's opinion, this Court will not be considering the reasons the ALJ might have proffered to support his opinion – this Court will only consider the stated reasons.[8] And, in this instance, the ALJ's cursory reasons are simply insufficient to create the sort of logical bridge between the evidence and his conclusion that is required. *See Phillips*, 413 Fed. Appx. at 885; *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000)(An ALJ must "build an accurate and logical bridge from the evidence to his conclusion."). That Ellsworth's opinion is "not supported by the record as a whole," without further explanation, is simply too vague to allow meaningful appellate review, especially given the record before this Court, which

---

[8] Just as the Court will not consider the reasons that Grosjean's counsel speculates the ALJ relied upon, the Court will not consider the Commissioner's response indicating that "[s]ince Dr. Wardell ... concluded that Plaintiff had no more than moderate difficulty in functioning, the ALJ had a reasonable basis for discounting Ellsworth's more severe limitations." Reliance on reasons not annunciated by the ALJ violates *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943).

-30-

is rife with evidence that *is* consistent with Ellsworth's opinions.

There may be good reasons for giving Ellsworth's opinion little weight, but the ALJ has failed to annunciate them. If Ellsworth's opinion were given greater weight, then a finding that the claimant is disabled would be likely: Ellsworth opined that Grosjean would miss in excess of three days of work per month, and the VE testified that absenteeism at that rate would be inconsistent with competitive employment. (Tr. 79, 763).


The ALJ's Consideration of Evidence from Dr. Hauschild

Grosjean also argues that the ALJ did not properly address the opinions of an examining psychologist, Dr. Hauschild. Dr. Hauschild performed a psychological evaluation of Grosjean at the request of Social Security. (Tr. 447). Dr. Hauschild found that Grosjean had a GAF of 47. (Tr. 452). He reported problems similar to those noted in psychological exams done at Park Center and in the report of Ellsworth.

The ALJ summarized Dr. Hauschild's findings, including his assignment of a GAF of 47, but did not explain what weight he gave to Dr. Hauschild's opinions. Whatever weight he assigned to the opinion, it was clearly not much. After his summary of Dr. Hauschild's report, the ALJ stated only the following:

> Although the GAF scores are only an indication of
> the claimant's functioning at a particular time
> and a subjective estimate of the claimant's
> status in the preceding two weeks [sic]. The

undersigned finds that the preponderance of the
GAF scores in the record above 50 support a
reasonable inference that the claimant
experienced only moderate difficulties in
functioning (DSM IV; Exhibits 17F; 20F). In
addition, the undersigned finds that the GAF
scores take into account the extreme difficulties
that the claimant was having with parenting her
two children. Although this is a foundational
reason for treatment, it is not an issue that
would be considered for purposes of a Social
Security Administration determination.

(Tr. 25).

The ALJ's finding that the preponderance of the GAF scores in the
record were above 50 is inaccurate. In his report dated October 2,
2009, Dr. Hauschild assigned a GAF of 47. (Tr. 447-52). Samant,
MSED, of Park Center issued an Initial Assessment and Plan dated June
21, 2010, assessing a GAF of 45. (Tr. 493-99). A treatment plan from
Park Center dated September 23, 2010, also included a GAF of 45. (Tr.
577-82). A treatment plan from Park Center dated December 21, 2010
includes a GAF of 45. (Tr. 556-61). A treatment plan from Park
Center dated late March 2011 assigned a GAF of 51. (Tr. 705-10). Dr.
Wardell's psychological testing report dated June 6, 2011, assigned
a GAF of 51. (Tr. 675-682).

The Commissioner argues that the scores from the treatment plans
dated September 23, 2010, and March of 2011, are merely reproductions
of GAF scores from earlier assessments. Grosjean contests this. This
Court has no idea who is correct in this regard, but ultimately it

does not matter: even if the challenged GAF scores[9] are not considered, at least three scores remain and only one of them is over 50. Because the ALJ's conclusion, lacking in substance to begin with, relied upon an inaccurate understanding of the factual record, the Court cannot say that it is based on substantial evidence.

Lastly, the ALJ presumes that the GAF accounts for parenting problems and that those parenting problems are irrelevant to the determination of disability. GAF scores are rated with respect to psychological, social and occupational functioning. Surely parenting falls within either the psychological or social categories, so the GAF may indeed reflect parenting problems, but the ALJ assumes without explaining that taking parenting problems into account would be inappropriate. There appears to be at least some connection between Grosjean's various mental impairments and her parenting insufficiencies: Samant noted in his evaluation of Grosjean that she was having difficulties with parenting due to limitations of her mental health conditions, and an evaluation by Drs. Wardell and Harrison found that Grosjean's depression was impacting her parenting in that she likely cannot generate the emotional and/or physical energy needed to parent effectively. (Tr. 493, 679). Surely her

_____

[9] The Court presumes that the Commissioner is challenging the GAF score of 45 reflected in the December 21, 2010, Park Center treatment plan as well as the two other scores appearing in Park Center treatment plans. Although it was not referenced explicitly, this is likely because Grosjean's citation in the opening brief erroneously referred to page 456 of the transcript rather than 556, making locating the GAF score difficult until it was properly cited to in the reply brief. (*See* DE 19 at 22, DE 29 at 6).

significant parenting problems at least suggest certain deficiencies might carry over to the workplace.

According to the Commissioner, the ALJ correctly gave little weight to Dr. Hauschild's GAF score of 47 because the Commissioner has determined that the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." (DE 24 at 6, citing 65 Fed. Reg. 50,746, 50, 746-65 (Aug. 21, 2000)). The Commissioner notes that, "[t]he GAF scale merely gives a clinician's opinion of a patient's single worst problem (symptom or limitation) at the time of the evaluation." (DE 24 at 7, citing DSM-IV-TR at 32-33). While this may be true, the ALJ did not make this argument, and the Commissioner's decision to advance it here therefore violates *SEC v. Chenery Corp.,* 318 U.S. 80, 93-95 (1943). As the Seventh Circuit noted in *Martinez v. Astrue*, this is a continuing problem in Social Security cases. *Martinez v. Astrue*, Nos. 10-1957, 10-2603, 10-2080, 2011 WL 148810 at *1 (7th Cir. Jan 19, 2011)("[I]n defiance of the principle of *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S.Ct 454, 87 L.Ed. 626 (1943), the Justice Department's lawyers who defend denials of disability benefits often rely heavily on evidence not (so far as appears) relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of harmless error.")(quoting *Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010)). The Seventh Circuit has recently described the Commissioner's continued violations of *Chenery* as nothing less

than professional misconduct for which sanctions are warranted.  While this Court will exercise its discretion by not imposing sanctions, this is a serious violation which will not be condoned by the Court.

Putting aside the *Chenery* violation, Seventh Circuit precedent suggests that GAF values have been viewed as one valuable indicator of ability to work in the past, albeit a finding of disability should not be based solely on a GAF score.  The DSM/IV-TR itself notes that a GAF in the range of 41-50 would reflect serious symptoms or any serious impairment in functioning, for example, being unable to keep a job.  DSM-IV-TR at 34.  For example, in *Campbell v. Astrue*, the Court noted that "A GAF rating of 50 does not represent functioning within normal limits.  Nor does it support a conclusion that [the claimant] was mentally capable of sustaining work."  *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010); *see also Zoephel v. Astrue*, 2013 WL 412608 (7th Cir. 2013).[10]


The ALJ's Credibility Assessment

Grosjean argues that the ALJ improperly discredited her testimony in violation of SSR 96-7p.  In light of the ALJ's other errors, this Court finds no compelling reason to explore this argument.  Once the

---

[10] The Court notes that the most current version of the Diagnostic and Statistical Manual no longer uses the GAF scoring system.  *Caldwell v. Colvin*, 2014 WL 4328317, at *5 n.2, No. 1:13-cv-01003-SEB-DML (Aug. 27, 2014).  However, because it was utilized by Grosjean's health care providers, it remains relevant here.

ALJ properly considers evidence from Ellsworth and Dr. Hauschild, he will need to reassess his opinion regarding Grosjean's credibility. In doing so, the ALJ should be mindful not to "cherry-pick" the evidence regarding Grosjean's daily living activities. *Scott v. Astrue*, 647 F.3d 734 (7th Cir. 2011)(ALJ may not "cherry-pick" from mixed results in order to support a denial of benefits).

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

DATED: September 12, 2014          /s/RUDY LOZANO, Judge
                                   United States District Court